UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re<br><br>**DOUGLAS A. SAAREL** and<br>**SUSANN E. SAAREL**,<br><br>Debtors. | Case No. **08-61684-11** |
| **DOUGLAS A. SAAREL** and<br>**SUSANN E. SAAREL**,<br><br>Plaintiffs.<br><br>-vs-<br><br>**OBB PARTNERS V, LLC**,<br><br>Defendant. | Adv No. **09-00037** |

## *MEMORANDUM of DECISION*

At Butte in said District this 15th day of September, 2009.

In this Adversary Proceeding, the Plaintiffs, Douglas A. Saarel and Susann E. Saarel ("Saarel"), and Defendant OBB Partners V, LLC ("OBB") filed a Stipulation on August 7, 2009, wherein the parties agreed to submit the issues in this Adversary Proceeding to the Court on stipulated facts and simultaneous briefs. This Memorandum of Decision sets forth the Court's findings of fact and conclusions of law.

The Stipulation between Saarel and OBB was approved and simultaneous briefs were filed on August 13, 2009. The following are the stipulated facts:

1

(a) On May 5, 2005, Saarel obtained a loan from OBB in the amount of $1,300,000 secured by a mortgage upon real property owned by Saarel in Park County, Montana, which mortgage was recorded with the Park County Clerk and Recorder on May 9, 2005. The mortgage covered the following described real property in Park County, Montana:

> Tract 40, Certificate of Survey 306; Tract 41 Certificate of Survey 306, Tract 42 Certificate of Survey 306, Tract 53 Certificate of Survey 308, Tract 55 Certificate of Survey 308, and Tract 1 Certificate of Survey 1421.

(b) Saarel requested, and OBB agreed, to release a parcel of the collateral in consideration of a partial pay down of the loan. The parties entered into a Loan Modification Agreement, pursuant to the terms of which Saarel paid the principal balance down to $597,600.00 and OBB executed a Partial Release dated March 30, 2006, recorded April 10, 2006, Recording No. 334430, which released tract 42 Certificate of Survey 306. The remainder of the above-described parcels continue to secure the loan made by OBB to Saarel. The Loan Modification Agreement also reduced the monthly installments from $13,541.67 to $6,218.75, effective August 5, 2006. The maturity date for the loan remained May 5, 2008.

(c) Saarel defaulted on the monthly installments due November 5, and December 5, 2007. Pursuant to the terms of the loan agreement, as modified, a Notice of Default was sent by OBB to Saarel. The amount necessary to cure the default was $17,821.68 and Saarels were granted to January 23, 2008, to cure the defaults. Saarel did not cure the noticed defaults by January 23, 2008.

(d) Saarels continued in default of their obligations under the promissory note, as modified by the loan agreement. Saarel and OBB negotiated a Second Loan Modification Agreement, which agreement was entered into by and between the parties on January 30, 2008.

The agreement generally provided that the Saarels would execute and escrow a deed in lieu of foreclosure and OBB would provide the Saarels until March 5, 2008, to bring the payments current as of March 5, 2008.

 (e) Pursuant to the parties' agreement, a Second Loan Modification Agreement was prepared by OBB's attorney, Davie Ambrose. The Second Loan Modification Agreement read, in part:

> Lender or its designee shall hold the original of the Nonmerger Deed in Lieu subject to the following:
>
> > (i) If, on or before March 5, 2008, Borrower brings current the Loan through and including the March 5, 2008, installment (namely including but not limited to payment of all monthly installments from and including the March 5, 2008, installments, accrued and unpaid interest, late charges, default interest, and costs and expenses), Lender shall return to Borrower the original of this Nonmerger Deed in Lieu to Borrower within seven (7) days of full payment of the amount to cure. Borrower shall be obligated thereafter to continue to provide payments in accordance with the Loan Documents, e.g. the monthly installment due April 5, 2008, and the balloon payment due May 5, 2008.
> >
> > (ii) If Borrower provides payment in full of the loan on or before August 5, 2008, namely including but not limited to full amount of principal, accrued and unpaid interest, late charges, default interest, and costs and expenses, Lender shall return to Borrower the original of the Nonmerger Deed in Lieu within seven (7) days of full payment.
> >
> > (iii) If Borrower fails to (a) bring current the Loan through and including the March 5, 2008, installment, and (b) provide payment in full of the Loan on or before August 5, 2008, Lender shall have the right but not the obligation to record the Nonmerger Deed in Lieu immediately thereafter, without further notice to Borrower. In the event Lender records the Nonmerger Deed in Lieu in accordance with this Agreement, Borrower also shall cooperate with Lender to effectuate the full and complete transfer of the Property to Lender, and shall not interfere in any matter with this transfer.

 (f) Saarel reviewed the Second Loan Modification and Saarel requested that the

3

following language be added to the Second Loan Modification Agreement: "[I]f Borrower does not satisfy 1.1(d)(i) above, but . . .". This language replaced the words "[I]f Borrower provides payment in full . . ." in the beginning of paragraph 1.1(d)(ii) of the Second Loan Modification Agreement.

The Second Loan Modification Agreement (App. 2) signed by the parties reads in paragraph 1.1(d)(ii) as follows:

> (ii) If Borrower does not satisfy 1.1(d)(i) above, but provides payment in full of the Loan on or before August 5, 2008, namely including but not limited to full amount of principal, accrued and unpaid interest, late charges, default interest, and costs and expenses, Lender shall return to Borrower the original of the Nonmerger Deed in Lieu with in seven (7) days of full payment. (App. 2, p.2).

(g) By email dated January 30, 2008, Erie Bergeson, administrative consultant to OBB, instructed Guardian Title in Livingston, Montana:

> "Please have the Saarels execute the attached documents and Jim Shires will forward his signed copies. As discussed with Jim, please hold the document until the loan is brought current through the March 5th payment by March 5, 2008, or the loan is paid in full before August 5, 2008, per the Agreement."

(h) The Second Loan Modification Agreement and Nonmerger Deed in Lieu of Foreclosure executed by Saarel and related instruments were, upon the terms of an Escrow Agreement executed by OBB and Saarel (App. 3), escrowed with Guardian Title Company in Livingston, Montana.

There is no ambiguity in paragraph 1.1(d)(i) of the Second Loan Modification Agreement. (See, Douglas A. Saarel Deposition, App. 4, pp. 13-16).

(i) The Second Loan Modification Agreement signed by the parties provided, in part, as follows:

4

> (i) If, on or before March 5, 2008, Borrower brings current the Loan through and including the March 5, 2008, installment (namely including but not limited to payment of all monthly installments from and including the November 5, 2007, installment through and including the March 5, 2008, installments, accrued and unpaid interest, late charges, default interest, and costs and expenses), Lender shall return to Borrower the original of this Nonmerger Deed in Lieu to Borrower within seven (7) days of full payment of the amount to cure. Borrower shall be obligated thereafter to continue to provide payments in accordance with the Loan Documents, e.g. the monthly installments due April 5, 2008, and the balloon payment due May 5, 2008. (App. 2, p.2).

Saarel did not make the payment on or before March 5, 2008, as stated in the agreement, and OBB did not return the Nonmerger Deed in Lieu to Saarel.

(j) Saarel subsequently requested on April 8, 2008, the amount that would be due on the loan for the delinquent payments from November 5, 2007, through March 5, 2008.

(k) By email dated April 8, 2008, Eric Bergeson, administrative consultant to OBB, provided Saarel with the amount of $40,132.88, and wire instructions for the payment. (App. 5).

(l) Payment of the sum of $40,132.88 was made by Saarel to OBB on April 11, 2008, at which time the April 5, 2008, payment was in default. On April 26, 2008, OBB sent and e-mail to Saarels thanking them for the payment and inquiring about sales or refinance of their property.

(m) On June 28, 2008, Jim Shires of OBB emailed Doug Saarel (Sky Ranch Seminars) as follows:

> Doug, I am not sure about the strategy of paying off one of the parcels that the deed in escrow covers. We can discuss it but it is not as easy as it sounds with the agreement we have in place. . . . We will need to discuss and I will need to come out and investigate which one and see how that affects our agreement in escrow . . . . (App. 6)

(n) On June 28, 2008, Jim Shires of OBB sent a followup email to Saarel (Sky Ranch

5

Seminars) which reads as follows:

> Doug, in the followup to the email just sent, I guess my point is that I really do not want to record a deed on any of your property and I think that the strategy has got to be get us paid off, as we are quickly running out of time for interim bankaid [sic] kinds of strategies. I am afraid there will not be time for new strategies. You know I will try to work with you Doug but I am really getting concerned about this. Jim (App. 7)

(o) Saarel never asked or requested that either Guardian Title, Jim Shires, OBB, or any of its representatives or any other person return the Deed in Lieu of Foreclosure to Saarel. Guardian Title continued to maintain possession of the Nonmerger Warranty Deed in Lieu of Foreclosure after the payment was made to OBB on April 11, 2008.

(p) Saarel did not pay the loan in full on or before August 5, 2008. The last payment made by Saarel to OBB on the loan was the payment made April 11, 2008.

(q) The Second Loan Modification Agreement provide, in part, as follows:

> SECTION 9. NO ORAL MODIFICATION
> This agreement is the entire, final and complete agreement of the parties relating to the subject of this agreement and supersedes and replaces all prior or existing written and oral agreements between the parties or their representatives relating thereto. No amendment or modification of this agreement shall be effective unless in writing executed by all parties to this agreement. (App. 2, p. 4)

(r) There is no written agreement modifying the Second Loan Modification Agreement.

(s) No one, including OBB, Jim Shires, its attorneys or representatives, ever told Saarel that the March 5, 2008, deadline to cure the defaults for the period of November 5, 2007, through March 5, 2008, was waived.

(t) On or about September 18, 2008, OBB recorded the Nonmerger Warranty Deed in Lieu of Foreclosure. (App. 8)

In addition to the above Stipulated Facts, the Court takes judicial notice of the fact that

6

Debtors' filed their voluntary Chapter 11 bankruptcy petition on December 2, 2008. Pursuant to the parties' Stipulation, the legal issues to be decided by this Court are:

    (a)    Was the payment deadline of March 5, 2008, specified in the Second Loan Modification Agreement, waived by acceptance of the payment of $40,132.88 by OBB on April 11, 2008, which, in turn, would have required OBB to release the escrowed Nonmerger Deed in Lieu of Foreclosure to Saarel?

    (b)    Was OBB entitled, pursuant to the terms of the written agreements between OBB and Saarel, to record the Nonmerger Deed in Lieu of Foreclosure because Saarel did not comply with the terms of the Second Loan Modification Agreement or should title be quieted in Saarel because OBB improperly recorded the Deed in Lieu of Foreclosure?

    (c)    Is the real property described in the Nonmerger Deed in Lieu of Foreclosure vested in fee simple title to OBB or is it property of the bankruptcy estate?

Relying on *Ahrens v. Cottle*, 271 Mont. 339, 896 P.2d 1127 (Mont. 1995), and *Boles v. Ler*, 222 Mont. 28, 719 P.2d 793 (Mont. 1986), Debtors seek to quiet title in certain real property on grounds that OBB's acceptance of Saarel's payment on April 11, 2008, "constitute[d] a waiver of any default in connection with the payment thereby requiring the deed in lieu to be returned to Saarels and not filed with the Clerk and Recorder." OBB counters that Saarel did not timely make the payment due on March 5, 2008, that OBB did not waive the March 5, 2008, deadline and that Saarel did not pay the loan in full by August 5, 2008, thus entitling OBB to record the Nonmerger Deed in Lieu of Foreclosure. OBB relies on *Trustees of the Washington-Idaho-Montana Carpenters-Employers Retirement Trust Fund v. Galleria Partnership*, 239

Mont. 250, 780 P.2d 608) (Mont. 1989) and *Thiel v. Johnson*, 219 Mont. 271, 711 P.2d 829 (Mont. 1985), to support its argument that OBB did not waive Saarel's default.

DISCUSSION

In *Ahrens*, the Ahrens sold a home to Cottle under a contract for deed. Cottle agreed to pay monthly installments to the Ahrens and also agreed to assume the balance owed to the Ahrens' mortgage lienholder. Cottle failed to make the April and May 1993 payments to the mortgage lienholder and the Ahrens thus taped a notice of default to the back door of Cottle's home. The Ahrens subsequently served Cottle personally with a notice of acceleration of the contract for deed. Cottle then cured the April and May 1993 default but later failed to make the payments due for September, October and November of 1993. The Ahrens made the September, October and November payments to the mortgage lienholder without serving Cottle with a notice of default.

The Ahrens filed suit in November of 1993 to cancel the contract for deed and secure possession of the home. Cottle then made the September, October and November of 1993, payments to the mortgage lienholder. Both parties filed cross-motions for summary judgment in the Ahrens' district court action. The district court entered summary judgment in favor or Cottle, finding that the Ahrens' attempt to tape the notice of default to the back door of Cottle's home constituted a material, rather than a technical, flaw in service, when the contract for deed required that a notice of default be delivered in writing personally or sent by registered or certified mail. The district court in *Ahrens* also held that: "The acceptance of a payment on a contract after the seller has declared or attempted to declare a default constitutes a waiver of the default and such waiver denies to the seller the right of the seller to sue for acceleration of the contract. *Bailey v.*

*Lilly* (1983), 205 Mont. 35, 667 P.2d 933. See also *Shultz [Schultz] v. Campell* (1996), 147 Mont. 439, 413 P.2d 879." *Ahrens*, 271 Mont. at 343, 896 P.2d at 1129. In affirming the district court's ruling, the Supreme Court of Montana concluded:

> Under the terms of the contract, appellants were required to first serve respondent with a notice of default as a precondition to serving a notice of acceleration. Appellants failed to properly serve respondent with a notice of default after the April and May defaults, and appellants failed to serve respondent with any notice of default after the September, October, and November defaults.

*Id.*, 271 Mont. at 344, 896 P.2d at 1130. "[B]ecause [Cottle] had not been served with notice of default," the Supreme Court of Montana held that the district court did not err in concluding that the Ahrens waived their right to terminate the contract for deed. *Id.*

Saarel also relies on *Boles, supra*, wherein the Boles purchased property from Ler under a contract for deed. The Boles tardily made their December 1982 payment to an escrow agent on February 8, 1983, made their January 1983 payment to the escrow agent on February 11, 1983, and made the February 1983 payment to the escrow agent on February 16, 1983. The escrow agent forwarded the checks to Ler.

Ler sent the Boles a notice of intent to cancel the contract for deed on February 10, 1983, and reaffirmed such desire in another letter dated February 24, 1983. In April of 1983, Ler returned the Boles' uncashed delinquent checks. The Boles filed suit against Ler seeking to enjoin Ler from foreclosing on the contract for deed. On cross-motions for summary judgment, the lower court directed the Boles to either pay the accelerated unpaid purchase price of the property, or in the alternative, to return possession of the property to Ler. After a dismissed and remanded appeal, the lower court then directed the Boles to either turnover possession of the property to Ler, or pay the accelerated balance within 75 days.

9

The Supreme Court of Montana in *Boles* considered the case of *Bailey v. Lilly* (Mont. 1983), 667 P.2d 933, and the correct ruling therein that "where a seller (i.e. Ler) continues to accept monthly payments under a contract for deed after she has sent the purchaser (i.e. Boles) a notice of default, such acceptance constitutes a waiver by the seller of any right to cancel the contract." *Id*. at 796. In upholding the district court's ruling in favor of Ler, the Supreme Court in *Boles* focused on the intent of the parties:

> [W]ith regard to the still valid rule expressed in *Bailey* above, the critical inquiry is whether the seller (i.e. Ler) charged with having "accepted" late payments actually "intended" to retain those payments. For example, in the *Bailey* case, involving a situation analogous to the present case, it was clear that the sellers (Baileys) had the intention to retain the late payments submitted to them by the purchasers (Lillies) because the money from these payments was never returned to the Lilly family. Clearly this is not the situation in the present case. In the present case, Ler did not have the intention of retaining the late payments submitted to her by the Boles.

*Id.*

OBB does not disagree with the rule of waiver articulated in *Boles* and *Ahrens*, but instead argues that under *Thiel* and *Galleria Partnership, supra*, it did not waive the March 5, 2008, deadline by accepting Saarel's payment on April 11, 2008. In *Thiel,* the Thiels sold certain real property to the Johnsons. The Johnsons made a down payment to the Thiels, agreed to make monthly payments to the Thiels on a contract for deed and also agreed to make payments on an underlying contract owed by the Thiels. The Johnsons were unable to make their January, February and April 1982 payments. The Thiels thus served the Johnsons with a notice of default on April 13, 1982, and served the Johnsons with a second notice of default on May 27, 1982. In a district court action commenced by the Thiels, the jury returned a verdict of $67,587.78 in favor of the Johnsons. On appeal, the Supreme Court of Montana explained that:

> Waiver is generally defined as a voluntary and intentional relinquishment of a known right, claim or privilege. [Citing cases.] *Mundt v. Mallon*, 106 Mont. 242, 76 P.2d 326; *Farmers Elevator Company of Reserve v. Anderson*, 170 Mont. 175, 552 P.2d 63. Waiver may be proved by express declarations or by a course of acts and conduct so as to induce the belief that the intention and purpose was to waive. *Northwestern Fire & Marine Insurance Company v. Pollard*, 74 Mont. 142, 238 P. 594.

*Thiel*, 711 P.2d at 831-32, quoting *Kelly v. Lovejoy* (1977), 172 Mont. 516, 565 P.2d 321. The Court in *Thiel* went on to explain that " [a]lthough waiver is mainly a question of intention and must be manifested in some unequivocal manner, a waiver may be founded upon express written statements, oral express statements or acts or conduct which induce the belief that the intention and purpose is to waive. Id.

The Court in *Thiel* affirmed the jury's finding that the Thiels' oral waiver altered the parties' written contract because the evidence showed that the Thiels had told the Johnsons that "they would be glad to extend their payments to be made until the summer season started rolling again." *Id*. at 832. Such finding was reiterated: "The evidence in this case, in the light most favorable to the Johnsons, was that after agreeing that they would waive the time for payments due in the first four months of 1982, Thiels suddenly, without warning to the Johnsons, sent a notice of default on April 13, 1982; that Thiels ousted the Johnsons from possession of the motel before the time for accelerated payment of the full debt had expired, by sending their agent, Larry Myers, to take possession of the motel and its furniture and equipment; that before moving to take possession, and to declare default, Thiels had advised the utility companies that the Johnsons were unable to pay their utility bills and that the motel premises were about to be repossessed." *Id.* at 833.

Finally, in *Galleria Partnership*, 780 P.2d at 611, a group of investors executed a

11

promissory note for a $1.2 million loan which was secured by a trust indenture on commercial property. The tenants in the commercial property began falling in arrears with their rent payments and as a consequence, the investor group began making their loan payments progressively latter. The secured lender was aware of why the loan payments were being made late and nonetheless continued to accept the late payments, together with late charges. The lender later commenced a district court action wherein the district court entered a decree of foreclosure directing the sheriff to sell the property. The beneficiaries of the trust indenture submitted the sole bid at the sale, in the amount of $565,000, which was approximately 30 percent of the original appraised value of the property. *Galleria,* 780 P.2d at 616.

The district court ruling was appealed on several grounds, but the issue pertinent to this Memorandum of Decision was whether the beneficiaries of the trust indenture waived their right to accelerate the balance due by their long acceptance of the investors' late payments. In *Galleria Partnership*, the Supreme Court of Montana concluded that the beneficiaries of the trust indenture did not wave their right to accelerate the entire balance because the trust indenture contained a nonwaiver provision that the Supreme Court was not willing to set aside:

> [W]e turn to the trust indenture and find in paragraph § 6.5 thereof that any delay or omission by the beneficiary in the exercise of any right, power, or remedy arising out of the trust indenture shall not impair any such right power or remedy, or the right of the beneficiary to resort thereto at a later date. Further such delay shall not be construed to be a waiver of any default or event of default under the indenture.
>
> * * *
>
> . . . . While we can conceive of cases in which the nonwaiver provisions of a contract should not be applied, the facts here do not warrant such a result. Not only must the evidence show a course of conduct by which one party waived the contractual obligations of the other party, but additionally, it seems to us, the

>evidence should show that the same party also waived any right to rely on the nonwaiver provisions of his contract. In other words, in this instance, since waiver is a known and voluntary relinquishment of a known right, those elements of waiver at least have to appear from the evidence before it can be held that the contractual right of nonwaiver has been waived.

In the case *sub judice,* Saarel has not shown that OBB expressly, either in a written or oral statement, waived the March 5, 2008, deadline and the resulting right to record the Nonmerger Deed in Lieu of Foreclosure in the event Saarel did not pay off the loan in full by August 5, 2008. Thus, Saarel must show that OBB, either through its acts or conduct, waived the March 5, 2008, deadline.

Saarel has failed to show that OBB waived the March 5, 2008, deadline. If Saarel brought the loan current by March 5, 2008, including the March 5, 2008, installment, OBB was to return the Nonmerger Deed in Lieu of Foreclosure to Saarel within 7 days of full payment of the amount to cure. Had the parties intended a waiver of the March 5, 2008, deadline, OBB would have returned the Nonmerger Deed in Lieu of Foreclosure or Saarel would have requested that the Nonmerger Deed in Lieu of Foreclosure be returned. When Saarel made the tardy payment of $40,132.88 on April 8, 2008, OBB did not return, and Saarel did not request the return of, the Nonmerger Deed in Lieu of Foreclosure. Accordingly, the Court concludes that OBB did not waive the March 5, 2008, deadline.

Saarel argues that by accepting the April 11, 2008, payment and recording the Nonmerger Deed in Lieu of Foreclosure on September 18, 2008, OBB got to "have its cake and eat it too" because "OBB got the benefit of both courses of the action and suffered none of the consequences as it not only received and accepted payments through March 5, 2008 it also retained and recorded the Deed in Lieu and avoided, among other things, a right of redemption.

13

OBB cannot have it both ways."

OBB did not "have its cake and eat it too" by failing to turnover the Nonmerger Deed in Lieu of Foreclosure after accepting the April 11, 2008, payment. The Second Loan Modification Agreement specifically provides that if Saarel did not timely cure the entire outstanding default by March 5, 2008, Saarel could still prevent losing the land by paying the contract balance in full by August 5, 2008. Indeed, it was not unreasonable for OBB to accept the April 8, 2008, payment with the assumption that Saarel would pay off the loan in its entirety by August 5, 2008. This belief is reflected in the June 28, 2008, emails between Jim Shires of OBB and Saarel wherein Jim Shires, on behalf of OBB, stated that OBB did not want to record a deed against Saarel's property, but that time was running out. The time that was running out was Saarel's time to payoff the loan by August 5, 2008, given Saarel's failure to timely make the March 5, 2008, payment. In sum, no evidence exists in the record to show that either OBB or Saarel intended to waive the March 5, 2008, deadline in the Second Loan Modification Agreement.

Moreover, because Saarel failed to make the payment due on March 5, 2008, and then failed to pay off the loan in full by August 5, 2008, OBB was entitled, pursuant to the terms of the written agreements between OBB and Saarel, to record the Nonmerger Deed in Lieu of Foreclosure. Therefore, the real property described in the Nonmerger Deed in Lieu of Foreclosure vested fee simple title in OBB.

IT IS THEREFORE ORDERED that the Court will enter a separate Judgment in favor of the Defendants, OBB Partners V, LLC. and against the Debtor/Plaintiffs, Douglas A. Saarel and Susann E. Saarel; and title to Tract 40, Certificate of Survey 306; Tract 41 Certificate of Survey 306, Tract 53 Certificate of Survey 308, Tract 55 Certificate of Survey 308, and Tract 1

Certificate of Survey 1421, shall remain properly vested with OBB Partners V, LLC in accordance with the Nonmerger Deed in Lieu of Foreclosure recorded by OBB Partners V, LLC.

                              BY THE COURT

                              */s/ Ralph B. Kirscher*
                              HON. RALPH B. KIRSCHER
                              U.S. Bankruptcy Judge
                              United States Bankruptcy Court
                              District of Montana